## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS

**FRANK C. LOVE**                                                                                         **PLAINTIFF**

**vs.**                                                          **No. 4:14cv00715 SWW**

**JONATHON COATS**                                                                              **DEFENDANT**

## BRIEF IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS

Comes Jonathon Coats in his personal capacity, through Arkansas Attorney General Leslie Rutledge and Assistant Attorney General Charles Lyford, and states for his Brief in Support of his Motion for Judgment on the Pleadings:

## I.    Introduction

This is a civil-rights suit under 42 U.S.C. § 1983 and Arkansas law.  The plaintiff also alleges false arrest, malicious prosecution, trespass, and other common-law torts.  The plaintiff was arrested while hunting on October 22, 2013 in Jackson County, Arkansas.  At that time, it was muzzle-loader season for deer. Defendant Jonathon Coats is a Wildlife Officer with the Arkansas Game and Fish Commission.  On the morning of the arrest, he heard a rifle shot, saw the plaintiff with a modern rifle, and saw a deer run past a clearing.  Asked what he was hunting, the plaintiff became agitated and stated he had shot at a feral hog, not a deer.  When the defendant asked if the plaintiff would provide his hunting license, he refused.  He told the officer he was trespassing and ordered him to leave.  A search of the plaintiff's land uncovered deer tracks, plots of deer food, deer feeders, and a spent shell from the plaintiff's rifle at the base of a deer stand.

The plaintiff was cited for the misdemeanors of failure to produce a hunting license, suspicion of hunting out of season, and possession of prohibited firearms. He was found guilty of failing to produce a license and charged $240.00, before the Jackson County Prosecutor agreed to a nolle prosequi. The plaintiff now claims his constitutional rights were violated. The pleadings, however, show that qualified immunity protects the defendant in his personal capacity.[1] The defendant either did not need probable cause to carry out his duties, or it was apparent to an objective wildlife offer that the plaintiff had committed the charged violations. For these and the reasons discussed below, qualified immunity applies and the claims must be dismissed.

## II.   Standard of Review.

Under Fed. R. Civ. P. 12(c), "after the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings" by challenging the likelihood that the non-movant can recover. *Wescott v. City of Omaha*, 901 F.2d 1486 (8th Cir. 1990); *see also* Fed. R. Civ. P. 8(a) ("A pleading . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."). Because a "formulaic recitation of the elements of a cause of action will not do," judgment on the pleadings should be granted if the allegations supporting a claim are merely "labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554 (2007). To survive dismissal, the complaint has to have alleged "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), quoting *Twombly*, 550 U.S. 554. For these

---

[1] The official-capacity claims were dismissed on the parties' motion. Doc. 11.

reasons a court is "not required to accept a plaintiff's legal conclusions." *Brown v. Medtronic, Inc.*, 628 F.3d 451 (8th Cir. 2010). Assuming they are fact-based and not conclusory, the allegations must tip the balance "between possibility and plausibility" of recovery, such that there is a "reasonable inference that the defendant is liable." *Iqbal*, 556 U.S. 662.

The movant's burden in a Rule 12(c) motion is essentially the burden in a motion to dismiss under Rule 12(b)(6). *Wescott*, 901 F.2d 1486. However, unlike a 12(b)(6) motion and its focus on the complaint, with Rule 12(c) a court may consider the complaint, the answer, and materials "necessarily embraced by the pleadings." *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077 (8th Cir. 1999) (citations omitted); *see also J.K.P. Foods, Inc. v. McDonald's Corp.*, 420 F. Supp. 2d 966 (E.D. Ark. 2006) (dismissing claims after reviewing "the complaint and the documents referenced in the complaint"). The plaintiff in this case quotes from and attaches Officer Coats's arrest report; the report and the two supplements written on the same day are "part of the pleadings, and courts may look at such documents 'for all purposes,' Fed. R. Civ. P. 10(c), including to determine whether a plaintiff has stated a plausible claim." *Brown v. Medtronic, Inc.*, 628 F.3d 451 (8th Cir. 2010), citing *M.M. Silta v. Cleveland Cliffs, Inc.*, 616 F.3d 872 (8th Cir. 2010). It is especially important to refer to the arrest reports given that the plaintiff himself "relied on the police reports in his complaint to support [his] allegation[s]." *Crenshaw v. Lister*, 556 F.3d 1283 (11th Cir. 2009); citing *Thompson v. Illinois Dept. of Professional Regulation*, 300 F.3d 750 (7th Cir. 2002) ("The fact remains that

where a plaintiff attaches documents and relies upon the documents to form the basis for a claim or part of a claim, dismissal is appropriate if the document negates the claim.").

## III.   Allegations in the Pleadings and Attachments to the Pleadings.

The complaint alleges that Jonathon Coats, "a duly . . . commissioned and elected Wildlife Officer of the Arkansas Game and Fish Commission," improperly monitored and arrested the plaintiff after entering his land "without permission or a search warrant."  Doc. 1, ¶¶ 5, 6.  The land in question is part of "approximately 820 acres located in Jackson County, Arkansas" within Deer Zone 8A.  *Id.*, ¶ 2, p. 14.  This is land bordered by hay fields that the plaintiff "owned and farmed," consisting of trees, "dense vegetation," a "bush hogged foot path," "tall grass," and "standing water."  *Id.*, ¶ 5, pp. 14-17.  On the land in the vicinity of the plaintiff's arrest were deer plots, deer feeders, and deer stands.  *Id.*, p. 17; Defendant's Exhibit A, pp. 1-2.  The plaintiff alleges the land is conducive to "hog hunting."  Doc. 1, ¶¶ 13-14.

There are pre-arrest, arrest, and post-arrest allegations with respect to events on this land.  Before he was arrested, the plaintiff claims the defendant "unlawfully entered" his property without a search warrant or permission, and "plac[ed] one or more covert cameras  . . . in an apparent attempt to catch Plaintiff committing a wildlife violation."  Doc. 1, ¶ 8.  The plaintiff points to three instances in September and October of 2013 when, "[t]o the best of Plaintiff's information, knowledge, and belief," the defendant installed and checked these cameras.  *Id.*, ¶¶

8-9.  At all such times, the defendant acted "in his individual and official capacities as a Commission Wildlife Officer."  *Id.*, ¶ 8.

The arrest occurred on October 22, 2013, when hunting deer was allowed with muzzleloading firearms.  Doc. 1, p. 14.  The day before, a caller asking to remain anonymous had contacted the defendant to claim a reward for reporting a wildlife violation; the caller stated that the plaintiff was likely to be hunting deer with a modern rifle the next morning, on his property to the south of Jackson County Road 4.  Doc. 1, ¶ 10.  The caller advised that the plaintiff would probably be driving a silver pick-up.  *Id.*  On October 22, 2013, the defendant reported wearing his Game and Fish uniform to the location stated in the call, and from approximately 5 a.m. to 6:30 a.m. waited on the outskirts of County Road 4.  Doc. 1, p. 14.  At 6:29 a.m. the defendant observed a silver truck pause at the property, at which point the driver unlocked a gate and drove past.  *Id.*  The defendant waited and followed the road leading into the property on foot, where he eventually came to the parked truck.  *Id.*  Visible inside the cab were a box of seven-millimeter Remington ammunition, a deer skinning tool, and a blood locating light among other items for hunting.  *Id.*, pp. 14-15.  The defendant could no longer see the driver of the truck, so he returned to his Game and Fish patrol vehicle and waited.  *Id.*, p. 15.

There was a rifle shot at about 8:40 a.m.  Doc. 1, ¶ 11, p. 15.  The defendant walked to a location within sight of the truck, which was still parked, and after twenty minutes a hunter appeared.  *Id.*, ¶¶ 11-12, p. 15.  The hunter carried a

5

modern rifle with a synthetic stock, and he was wearing blaze-orange over a camouflage jumpsuit. *Id.* As the defendant watched the hunter through binoculars, a small deer walked out of the tree line between them. *Id.*, p. 15. The hunter raised his own binoculars in response to the movement and appeared at that time to spot the defendant. *Id.* The deer ran back into the wooded area as the hunter turned for the truck. Doc. 1, p. 15. The hunter put his rifle and binoculars in the truck before confronting the defendant. *Id.*

The hunter identified himself as Frank Love, the plaintiff, and stated that the defendant was trespassing and needed to leave. *Id.* The plaintiff was agitated, and he continued to accuse the defendant of trespassing as the defendant stated that he was a wildlife officer. *Id.* The plaintiff confirmed he had fired the modern rifle, but said the shot "was just me, I'm hog hunting." Doc. 1, ¶¶ 13-14. When the defendant asked to see a hunting license, the plaintiff responded that he "did not have to . . . because he was hog hunting." *Id.*, p. 16. The plaintiff also failed to provide a driver's license despite admitting that he drove onto the land in the silver truck. *Id.* The defendant asked if he had hit the deer with the rifle shot, and the plaintiff said no before stating again that he was hog hunting. *Id.* Although his rifle was mounted with a scope, the plaintiff stated he had missed a hog at sixty yards. *Id.* The defendant noted there was one round in the rifle's chamber and two in its three-round magazine. Doc. 1, p. 16. The defendant noted the plaintiff's still agitated manner; the plaintiff told the defendant he had to leave and used a cell phone to call his attorney. *Id.*

The defendant informed the plaintiff he was being placed under arrest for suspicion of hunting with a modern rifle out of season, "[n]otwithstanding Plaintiff's statement that he was hog hunting." *Id.*, ¶ 14, p. 16. The plaintiff was handcuffed and asked to sit where he would be the most comfortable until deputies from the Jackson County Sheriff's Office could arrive. *Id.*, p. 16. When they did, the handcuffs were removed and the plaintiff rode to the Jackson County Jail in the front seat of a deputy's vehicle. *Id.*, pp. 16-17. The defendant released the plaintiff's truck and its contents to a towing service after taking an inventory. Doc. 1, p. 17.

The defendant and two sheriff's deputies, one of whom reported with a K-9 unit, searched the plaintiff's land for the deer. *Id.*, p. 17; Defendant's Exhibit A. The deputies did not immediately uncover tracks or blood. Doc. 1, p. 17. However, they found a deer stand and a 7 millimeter casing at the base of the stand in the area where the defendant believed the plaintiff fired his rifle. *Id.*; Defendant's Exhibit A. Deputy Robby King saw fresh mud on the steps. Defendant's Exhibit A, p. 1. The casing smelled of freshly ignited powder, and it was free from dew, unlike the surrounding grass. Doc. 1, p. 17. The defendant concluded that the modern-rifle casing had been ejected earlier that morning. *Id.*

The defendant and the deputies found fresh deer tracks approximately 60 yards from the deer stand. *Id.*, Defendant's Exhibit A. According to Deputy King, the area "was full of fresh deer tracks." Defendant's Exhibit A, p. 1. There were fresh boot prints alongside the tracks, which followed until the tracks disappeared

into tall grass. Doc. 1, p. 17. The boot prints then returned to the stand. *Id.* Deputy Randy Rhodes located two additional deer stands overlooking deer food plots and feeders. Defendant's Exhibit A, p. 2.

At no point did the defendant see hog tracks, feces, or other signs that a hog had disturbed the deer plots and feed. *Id.* Deputy King likewise "never saw a hog track" during the search. Defendant's Exhibit A, p. 1. Deputy Rhodes "was unable to find any evidence of a single hog on the property." Defendant's Exhibit A, p. 2. Although "hogs will root a food plot . . . and they definitely eat feed that is placed for deer," Deputy Rhodes noted there were "no hog sign[s] around the food plots or deer feeders." *Id.* Nor had the game cameras on the property captured images of wild hogs. Doc. 1, p. 17.

The plaintiff was charged with refusing inspection by a wildlife officer, hunting wildlife/deer in closed season, and possession of prohibited firearms during muzzleloader season. Doc. 1, ¶ 15. At a bench trial in Jackson County District Court, the judge heard sworn testimony that "Plaintiff was not able to produce proper identification." *Id.*, ¶ 17. The plaintiff agreed he did not have a license, but said he did not need one because "he was hog hunting on his private property." *Id.* According to the complaint, "Defendant Coats and other Commission game wardens testified under oath that Plaintiff was, in fact, hunting deer . . . with a prohibited weapon." *Id.* Because he failed to produce a hunting license, the district judge found the plaintiff guilty of refusing inspection and issued a fine of $240.00. *Id.*, ¶ 18. The plaintiff was found not guilty of the other charges. *Id.* The plaintiff

appealed to Jackson County Circuit Court and moved to compel the identity of the caller who had contacted the defendant the night before the arrest.  Doc. 1, ¶ 20. The Jackson County Prosecutor and the Game and Fish Commission agreed to enter a nolle prosequi instead of pursuing the $240.00 fine, and the refusing-inspection charge was dismissed.  Doc. 1, ¶ 23.

## IV.    Qualified immunity applies to this warrantless arrest.

On a motion to dismiss, a government defendant is entitled to qualified immunity unless the pleadings (1) make a prima facie case for violation of a federal right, and (2) this right was clearly established at the time of the alleged misconduct.  *Saucier v. Katz,* 533 U.S. 194 (2001).  In other words, the plaintiff cannot recover unless the defendant "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known."  *Joseph v. Allen*, 712 F.3d 1222 (8th Cir. 2013), quoting *Gorra v. Hanson*, 880 F.2d 95 (8th Cir. 1989).  A qualified-immunity question "should be decided at the earliest possible stage of litigation," given that the doctrine acts "both [as] a defense to liability and a limited 'entitlement not to stand trial or face the other burdens of litigation.'" *Gorra*, 880 F.2d 95; *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (citations omitted).  Thus, motions for judgment on the pleadings are appropriate vehicles for examining this "question of law."  *Gorra*, 880 F.2d 95; *see also Iqbal*, 556 U.S. 662 (ordering dismissal because of qualified immunity where the plaintiff "fail[ed] to plead sufficient facts to state a claim for purposeful and unlawful discrimination").

The plaintiff has sued a law-enforcement officer in connection with an arrest from October 22, 2013.  Doc. 1, ¶¶ 27-32.  The parties agree the plaintiff was arrested for failure to produce a hunting license, possession of prohibited firearms, and suspicion of hunting out of season.  Doc. 1, ¶ 15; Doc. 8, ¶ 11.  The question is this: did the defendant, acting as an officer of the Arkansas Game and Fish Commission, violate a clearly established federal right when he observed, detained, and arrested the plaintiff?  The answer is no.  The open-field doctrine means the defendant did not need probable cause to monitor the plaintiff's land, so he was entirely within his rights to observe the plaintiff on his hunting grounds.  Moreover, the pleadings show beyond question that there was probable cause for the arrest.  A proper search of the plaintiff's property followed.  This much is obvious even taking the well-pled allegations as true, so the claims must be dismissed under Fed. R. Civ. P. 12(c).

### A.    The plaintiff describes events in a open field, where there was no expectation of privacy.

The Fourth Amendment protects some searches but not others: it does not apply unless the search involves "persons, houses, papers [or] effects."  U.S. Const. Amend. IV.  An open field[2] is different than a house, and the "distinction between the [field] and the house is as old as the common law."  *Hester v. United States*, 265 U.S. 57 (1924); *see also Oliver v. United States*, 466 U.S. 170 (1984) (affirming *Hester* and rejecting argument that open fields were "'effects' within the meaning of the Fourth Amendment").  A governmental "intrusion upon the open fields is not

---

[2] Any "open and unoccupied" area beyond the "land immediately surrounding and associated with the home."  *Oliver v. United States*, 466 U.S. 170 (1984) (citations omitted).

one of those 'unreasonable searches' proscribed by the text of the Fourth Amendment." *Oliver*, 466 U.S. 170, quoting *Hester*, 265 U.S. 57 ("[T]he special protection accorded by the Fourth Amendment . . . is not extended to the open fields."). This is true under the Arkansas Constitution as well, which "is virtually identical to the Fourth Amendment" with respect to search and seizure. *Hudspeth v. State*, 349 Ark. 315, 78 S.W.3d 99 (2002) (The Arkansas Supreme Court analyzes unreasonable searches "in the same manner as the United States Supreme Court interprets the Fourth Amendment.").

As a corollary to the lack of "legitimate expectation that open fields will remain free from warrantless intrusion," the validity of an open-field search does not depend on common-law property interests. *Oliver*, 466 U.S. 170. Rather than leave law-enforcement officers "guess[ing] before every search whether landowners had erected fences sufficiently high [or] posted a sufficient number of warning signs," an officer searching an open field need not stop with the owner's "subjective expectation of privacy." *Id.* (holding that "in the case of open fields, the general rights of property protected by the common law of trespass have little or no relevance to the applicability of the Fourth Amendment"). What matters instead of subjective beliefs are "those expectation[s] that society is prepared to recognize as reasonable." *Id.* (quotations omitted). The belief that an open field should be free from observation or search is not reasonable. And Arkansas courts have held that one of the alleged *methods* of search at issue—video or motion-capture cameras—"in

no way violate the Fourth Amendment" when applied to open fields. *Hudspeth*, 349 Ark. 315, 78 S.W.3d 99.

There is no doubt whatsoever that when the parties met on October 22, 2013, they were far from an "area immediately adjacent to the home" protected from unreasonable search. *Oliver v. United States*, 466 U.S. 170 (1984). The plaintiff says he was "hog hunting" on 820 acres of land he also farmed; the arrest report and supplements attached to the pleadings describe rural acreage with "dense vegetation," a "bush hogged foot path," "tall grass," "standing water," deer feed, and deer stands. Doc. 1, ¶¶ 5, 13-14, pp. 14-17; Defendant's Exhibit A, pp. 1-2. In this location, there was no risk of intrusion on any "intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" *Oliver v. United States*, 466 U.S. 170, quoting *Boyd v. United States*, 116 U.S. 616 (1886). The land was an open field.

Many of the plaintiff's claims are based on the allegation that the defendant was trespassing on land he owns, but this is a non-dispositive, "merely subjective expectation." *Oliver v. United States*, 466 U.S. 170 (1984). The plaintiff had no objective expectation in preventing a Game and Fish officer from monitoring the land, nor could he demand that the defendant produce a warrant before coming onto it. Arkansas law allows the defendant[3] to "go upon any property outside of private dwellings, posted or otherwise, in the performance of [his] duties . . . and to conduct searches with or without a warrant." *Rainey v. Hartness*, 339 Ark. 293, 5 S.W.3d

---

[3] The parties agree the defendant was "acting . . . under the color of law and his authority as a duly constituted, sworn, commissioned and elected Wildlife Officer" over the relevant time period. Doc. 1, ¶ 6; Doc. 8, ¶ 3.

410 (1999) (quoting Ark. Admin. Code 002.00.1-01.00-B ("Duties and Authorities of Wildlife Officers")).  In *Rainey*, the Arkansas Supreme Court held that an officer's "entry onto [an open field] on his four-wheel vehicle did not violate the Fourth Amendment" or the Arkansas constitution.  *Rainey*, 339 Ark. 293, 5 S.W.3d 410. Neither were the officer's "actions in climbing up [a] ladder to look into [the appellants'] deer stand" problematic; there was no Fourth-Amendment protection for a stand sitting in an open field, so the appellants could not object to its warrantless search.  *Id.*  The plaintiff's allegations here are almost identical.  He states that the defendant "unlawfully entered onto [his] property . . . without reasonable suspicion" and later "returned to [his] property" on the day of the arrest. Doc. 1, ¶¶ 8, 11.  But a wildlife officer does not need reasonable suspicion to patrol open fields, for one thing because "public and police lawfully may survey [such] lands from the air."  *Oliver*, 466 U.S. 170.  More to the point, a wildlife officer patrolling open fields is doing his job, something the defendant tried to explain while the plaintiff told him he was trespassing.  Doc. 1, p. 15.

The plaintiff also alleges the defendant "plac[ed] one or more covert cameras" on his property, but doing so was both permissible and irrelevant to the arrest. Permissible, because "a warrant is not required when video surveillance is used to record activity in an area where the suspect has no reasonable expectation of privacy."  *Hudspeth v. State*, 349 Ark. 315, 78 S.W.3d 99 (2002) (dismissing claim that placement of a "ground hog video camera" on "an undeveloped ten-acre tract, abutting a twenty-acre undeveloped tract" was an unreasonable search).  The

defendant does not contest there were cameras on the plaintiff's property, but the plaintiff's property is open field in rural Jackson County. The "covert cameras" are also irrelevant, because they did not contribute at all to the probable cause for the plaintiff's arrest. The parties agree the plaintiff was arrested because the defendant believed he had shot his modern rifle at a deer out of season, and because the plaintiff did not have hunting license. Doc. 1, ¶¶ 13-15; Doc. 8, ¶ 11. Nothing creating reasonable suspicion of these violations was made available to the defendant by a camera, although the defendant checked cameras on the land afterward as a lawful search incident to arrest. Doc. 1, p. 17; *see also* Ark. R. Crim. P. 12.5 and parts IV.B and V, below. Even assuming that "use of the . . . video camera was an illegal search, it has no causal connection" to the plaintiff's claims. *Hudspeth*, 349 Ark. 315, 78 S.W.3d 99.

The result under federal law is the same: the plaintiff "may not legitimately demand privacy for activities conducted out of doors in fields." *Oliver*, 466 U.S. 170. *Oliver* considered two petitions for certiorari, both of which involved searches by officials who acted on tips[4] that property owners were growing marijuana, either "on [a] farm" or "in the woods." *Id.* In one instance, officials "drove past . . . a locked gate with a 'No Trespassing' sign" before occupants ordered them to leave. *Id.* Not only did the officials "not have a warrant authorizing the search," but there was admittedly "no probable cause." *Id.* However, the farm and woods were open fields, and it did not matter if the intrusion may have been "a trespass at common law"

---

[4] One of these leads was "an anonymous tip." *Id.* The Court was not concerned with the identify of the caller. The name of the person who contacted Wildlife Officer Coats the day before the plaintiff's arrest is equally immaterial. See part IV.C, below.

with respect to the landowners' fences and signs.  *Id.*  Because "open fields do not provide the setting for those intimate activities that the [Fourth] Amendment is intended to shelter," there was simply no "'search' in the constitutional sense." *Oliver*, 466 U.S. 170.

Here, the defendant's observation of and entry onto the plaintiff's land was not a constitutional search.  Taking the pleadings as true, the defendant "entered onto Plaintiff's property . . . placing one or more covert cameras," "returned to Plaintiff's property . . . to check the covert cameras and adjust the angle," "entered onto Plaintiff's property . . . to remove the covert cameras," and "returned to Plaintiff's property" the day of the arrest.  Doc. 1, ¶¶ 8, 9, 11.  It is undisputed this property is an open field—home to feral hogs, according to the plaintiff—so the defendant did not need probable cause or a warrant in order to observe it by camera or in person.  The defendant is entitled to qualified immunity with respect to all claims of "unreasonable" searches of the land in question.

## B.     There was probable cause for the arrest.

Qualified immunity shields from personal liability "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335 (1986).  In the context of probable cause, an officer need only show the "objective legal reasonableness" of his position that "the totality of the circumstances at the time of the arrest" indicated a violation had occurred.  *Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Borgman v. Kedley*, 646 F.3d 518 (8th Cir. 2011) (quotations omitted).  Notably absent from this analysis is the officer's subjective

motivation, even if he "mistakenly arrest[ed] a suspect believing [the arrest was] based on probable cause." *Fisher v. Wal–Mart Stores, Inc.*, 619 F.3d 811 (8th Cir. 2010) (noting that probable cause is a question of law). Where there is "at least arguable" probable cause, qualified immunity for a warrantless arrest follows, and the "fact that the person arrested is later found innocent is not material." *Joseph v. Allen*, 712 F.3d 1222 (8th Cir. 2013) (quotation omitted); *Linn v. Garcia*, 531 F.2d 855 (8th Cir. 1976). Arkansas law is essentially the same: "probable cause to arrest without a warrant exists when the facts and circumstances . . . are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Friend v. State*, 315 Ark. 143, 865 S.W.2d 275 (1993) (citations omitted) (noting that "probable cause does not require that degree of proof sufficient to sustain a conviction").

The plaintiff was charged with three misdemeanors: Ark. Admin. Code 002.00.1-05.28 ("Refusing Inspection by Wildlife Officer"), Ark. Admin. Code 002.00.1-06.03 ("Certain Firearms Prohibited During Muzzleloading Seasons"), and Ark. Admin. Code 002.00.1-05.01 ("Hunting Wildlife in Closed Season"). Doc. 1, ¶ 15. The defendant is entitled to qualified immunity because the totality of the circumstances (determined from the pleadings, accepting as true the plaintiff's well-pled allegations) was such that a reasonable officer would have suspected criminal conduct at the time of arrest. Qualified immunity based on reasonable suspicion also sinks the tort claims based on the arrest and subsequent prosecution. *See* part V, below.

Taking the violations in order, Refusing Inspection is a "refus[al] to immediately surrender the following items to a wildlife officer upon request for lawful inspection: . . . license [or] permit." Ark. Admin. Code 002.00.1-05.28.[5] The pleadings and attachments make clear that the two elements necessary for this violation were present: a wildlife officer made a lawful request, and the plaintiff did not have his hunting license. The plaintiff admits the defendant was on official business when their encounter occurred; the defendant was in uniform and identified himself as an enforcement officer. Doc. 1, ¶ 6, p. 15. The plaintiff does not contest that the defendant asked him for his license. Nor does the plaintiff claim to have had a license on his person or in his truck. He admits he did not. See Doc. 1, ¶¶ 13-14, 17.

But hunting without a license did not justify an arrest in his case, the plaintiff says. The plaintiff told the defendant he had shot at a hog, so he did not need a license and the defendant was trespassing. Doc. 1, ¶¶ 13-14, 24. It is true an animal meeting the definition[6] of feral hog is "deemed . . . a public nuisance" by Arkansas law, and true a "person may capture or kill a feral hog . . . [o]n private land if the person is the landowner." *See* Ark. Code Ann. § 2-38-501 *et seq.* However, the defendant was entitled to rely on the totality of the circumstances,

---

[5] *See generally* Ark. Admin. Code 002.00.1-03.01 ("It is unlawful to hunt or fish when and where a license, permit, tag or stamp is required without having on the person the appropriate license, permit, tag or stamp.") *and* Ark. Admin. Code 002.00.1-03.03 ("It is unlawful for a resident to hunt wildlife by any means in Arkansas without possessing on the person the appropriate Arkansas hunting license . . . .").

[6] "'Feral hog' means an animal or hybrid animal of either the family Suidae, including without limitation a wild hog, Russian or European wild boar, and Old World swine, or the family Tayassuidae, including without limitation peccary, javelina, and New World swine, that is or has been roaming freely upon public land or private land." Ark. Code Ann. § 2-38-501(1)(A).

and the plaintiff's statement about what he had been doing was at best one point to consider. *Borgman v. Kedley*, 646 F.3d 518 (8th Cir. 2011).

Especially here, when the defendant "at first heard only [a rifle shot], could not see what occurred inside [the tree line], and did not witness the entire altercation." *Joseph v. Allen*, 712 F.3d 1222 (8th Cir. 2013) (holding that a witness statement "amounted to conflicting evidence," not "plainly exculpatory" testimony; affirming summary judgment for arresting officers on qualified immunity).  It is undisputed that the plaintiff fired his rifle out of sight of the defendant.  Doc. 1, ¶ 11 (quoting the defendant's arrest report).  Then the plaintiff walked out of a tree line carrying the rifle, the defendant saw a deer and observed the plaintiff raise his binoculars in the deer's direction, and walk quickly to his truck to put the rifle away, apparently having seen the defendant.  Doc. 1, ¶¶ 11-12, p. 15.  The parties met, the defendant asked for a hunting license, and the plaintiff admits he did not comply.

Assuming for purposes of argument that "hog hunting" is a defense to refusing inspection, this would be relevant at trial, not during arrest.  The Arkansas Court of Appeals rejected an argument tracking the plaintiff's almost verbatim, in fact.  In *Blair v. State*, 16 Ark. App. 1, 696 S.W.2d 755 (1985), wildlife officers saw individuals walking in a cemetery as "[d]ogs were running nearby."  A third person waited in a truck.  *Id.*  The officers asked for hunting licenses (which these suspects had) and saw that one suspect carried a shotgun loaded with buckshot.  *Id.*  There was more buckshot in the truck, and the Court noted that "the use of buckshot was

prohibited as it was muzzle loading season." *Id.*  The officers duly cited the hunter carrying the gun with "attempting to take deer with a modern firearm in muzzle loading season."  *Blair*, 16 Ark. App. 1, 696 S.W.2d 755.  At trial, the hunter "claimed that he was hunting rabbits."  *Id.*  The Court held that between the modern weapon, modern ammunition, and the dogs, "circumstances certainly entitled the jury to reach the conclusion that [the hunter] was hunting deer."  *Id.*  If a *guilty verdict* is proper despite a hunter's claim that he was not shooting at deer out of season, an arrest surely is.  *Linn v. Garcia*, 531 F.2d 855 (8th Cir. 1976) (In determining probable cause, "[i]t is not material that the person arrested may turn out to be innocent.").

As in *Blair*, the plaintiff was arrested for violating Firearms Prohibited During Muzzleloading Season and Hunting Wildlife in Closed Season.  These regulations are premised on hunting with a non-designated firearm, depending on the hunting zone and time of year.  Ark. Admin. Code 002.00.1-06.03 makes it illegal to "hunt deer . . . during the muzzleloading deer . . . season[] with, or to possess . . . firearms capable of being loaded by means other than through the muzzle."  Ark. Admin. Code 002.00.1-05.01 likewise prohibits "hunt[ing] any species of wildlife other than during a season opened by the [Game and Fish] Commission and by using legal methods for that season."  For purposes of qualified immunity and probable cause, the question is whether the plaintiff has alleged facts that

would, objectively speaking, raise suspicion of hunting[7] deer with a non-muzzleloading firearm.

The defendant plainly relied on reasonable suspicion when he made the arrest. First, the plaintiff fired a shot from a firearm "capable of being loaded by means other than through the muzzle," specifically a "black synthetic rifle with a brushed stainless steel barrel" and a scope. Doc. 1, ¶ 12 (quoting the arrest report), p. 15. Second, the defendant saw the plaintiff carry this rifle and walk with it to his truck; the plaintiff does not deny this or say the rifle belonged to someone else. *Id.* Third, the plaintiff does not dispute that on the day of his arrest, Arkansas law limited deer hunting to muzzleloaders. *See* Doc. 1, p. 14 (noting that the plaintiff's property was "fully and completely located in Deer Zone 8A," and on "October 22, 2013 in Deer Zone 8A, deer muzzleloader season was open"). The plaintiff does not dispute the defendant's narrative from the arrest report that a deer ran into a clearing after the plaintiff walked past the tree line. Doc. 1, p. 15. He claims only that the defendant did not "personally eyewitness [him] shoot at a deer," and says no "harvested deer" was found. Doc. 1, ¶ 12. The plaintiff does not say the defendant *did* see him shoot at a feral hog, nor does he claim to have shown the defendant a hog carcass or other evidence of a nuisance animal. The plaintiff does not dispute that he walked to his truck to put away his modern rifle before approaching the defendant. Doc. 1, pp. 15-16. The plaintiff does not dispute that he

---

[7] Under Arkansas law the "possession of any . . . killing device . . . in fields, forests, along streams or in any location known to be game cover, shall create a rebuttable presumption and shall be considered along with other evidence as prima facie evidence that the possessor is or has been hunting." Ark. Admin. Code 002.00.1-01.00-F.

appeared agitated, and does not dispute that he told the defendant repeatedly he was trespassing.  *Id.*

There was probable cause to suspect the plaintiff had used his modern rifle to fire at a deer.  It is a violation to "possess" a non-muzzleloading firearm while hunting during muzzleloader season—that the plaintiff was a hunter carrying a modern rifle out of season would create suspicion enough.  *See* Ark. Admin. Code 002.00.1-06.03.   However, after the plaintiff fired a shot from the rifle, the defendant saw a deer and observed the plaintiff raise his binoculars as the deer came into view.  While the plaintiff claims he was arrested "[n]otwithstanding [his] statement that he was hog hunting," by itself this carries little or no weight.  *See Royster*, 698 F.3d 681 (stating that an officer "need not rely on an explanation given by the suspect") (citations omitted); *Hutton v. Strickland*, 919 F.2d 1531 (11th Cir. 1990) (stating that a suspect's "beliefs concerning the legality of [his actions] are irrelevant to qualified immunity analysis"); *Wright v. City of Philadelphia et al.*, 409 F.3d 595 (3d Cir. 2005) (noting that "officers did not believe [the suspect's] explanation" for what had occurred, and finding probable cause because their "belief was not unreasonable in light of the information the officers possessed at the time").  Deciding between "conflicting information that cannot be immediately resolved" is precisely what an arresting officer does when assessing probable cause.  *Borgman v. Kedley*, 646 F.3d 518 (8th Cir. 2011).  The plaintiff said he had shot at a hog, and based on the totality of the circumstances and his law-enforcement experience, the defendant concluded the plaintiff had shot at a deer.

Qualified immunity applies "even where an officer mistakenly arrests a suspect believing it is based on probable cause," so long as the mistake is "objectively reasonable." *Joseph*, 712 F.3d 1222 (quotation omitted). The plaintiff admits he had no hunting license and admits he was hunting with a modern rifle during muzzleloader season, both of which are evidence of violations. The only arguably open question was whether the plaintiff shot at a deer or a feral hog. Assuming hypothetically that the defendant was incorrect about the plaintiff's target, it was still reasonable to believe he was hunting deer: the plaintiff fired a modern rifle; neither the plaintiff nor the defendant saw a feral hog during their encounter; the defendant saw a deer in the plaintiff's line of sight; and the plaintiff's body language and tone of voice indicated to the defendant that a violation had occurred.

The defendant may have made a reasonable mistake, but he was not required to "conduct a 'mini-trial' before effectuating [the] arrest" in order to eliminate all doubt of the plaintiff's guilt. *Kuehl v. Burtis*, 173 F.3d 646 (8th Cir. 1999). And a wildlife officer is permitted to look past the claim that a hunter was using a modern firearm, just not to hunt deer. *Blair v. State*, 16 Ark. App. 1, 696 S.W.2d 755 (1985) (though suspect said he was "hunting rabbits," the totality of circumstances "entitled the jury to reach the conclusion that [he] was hunting deer"). Because Officer Coats acted prudently under the circumstances described in the complaint, it cannot be said he "knowingly violate[d] the law" of warrantless arrest. *Malley v.*

*Briggs*, 475 U.S. 335 (1986).  Instead, there was probable cause and the defendant is entitled to qualified immunity.

>    **C.     The anonymous lead would bolster probable cause, but the call was not the reason for the arrest.**

The defendant received a phone call on October 21, 2013, the day before the plaintiff's arrest, from an individual with information about the plaintiff's likely whereabouts the next morning.  Doc. 1, ¶ 10.  The caller sought a reward for reporting a potential hunting violation and asked to remain anonymous.  *Id.* According to the caller, the plaintiff would be hunting deer with a modern rifle on his property to the south of Jackson County Road 4.  *Id.*  The caller advised that the plaintiff would be driving a silver pick-up, although the caller was not sure if he would be wearing an orange hunting vest.  *Id.*  In his complaint, the plaintiff alleges that the defendant "never questioned the veracity or motive of the alleged informant, nor did Defendant Coats at any time attempt to substantiate the information allegedly provided."  *Id.*

The plaintiff appears to argue that his arrest was invalid because the caller did not want his or her name to be made public, but this is meritless because the call itself "is not a relevant issue to the cause before the trial court."  *Wirtz v. Continental Finance & Loan Co. of West End*, 326 F.2d 561 (5th Cir. 1964) (holding that an informant's tip was immaterial when an "entire [civil] case could be proved by the use of a single witness").  The plaintiff's lawsuit involves one encounter between two people, the defendant and himself, on the morning of October 23, 2013. With or without the phone call, a prudent wildlife officer would have had reason to

suspect the plaintiff did not have a hunting license, was hunting with a modern rifle in muzzleloader season, and had fired that modern rifle at a deer. Likewise, the phone call may have led the defendant to check part of the plaintiff's land at a specific time, but that land is an open field. The defendant could have observed and entered it at *any* time. In short, the "probable cause for the arrest . . . was not dependent upon the previously established reliability of the confidential informant." *United States v. Burgess*, 402 F.2d 85 (8th Cir. 1968) (holding that the trial court had "quite properly refused the demand of [a criminal defendant] that the confidential informer be identified and his veracity and reliability tested under cross examination").

It must also be emphasized that the person who called the defendant "was not actually involved in the arrest or alleged offense." *Miller v. State*, 2011 Ark. App. 554, 386 S.W.3d 65 (2011). That is, none of the violations for which the plaintiff was arrested on October 22, 2013 were "behavior[s] specifically witnessed or participated in by the informant." *Id.* (refusing to order disclosure of an anonymous tipster's identity when "the defendant [was] charged only with possession and the informant merely supplied information leading up to the search"). The call here was a lead, whereas the arrest was based on the defendant's personal interaction with the plaintiff. Furthermore, the question with respect to Officer Coats involves "not guilt or innocence, but . . . probable cause." *McCray v. Illinois*, 386 U.S. 300 (1967) (noting that an informant's identity is not necessary "in a federal criminal trial, let alone in a preliminary hearing to determine probable

cause for an arrest or search"). And in this civil case, the caller's identity is even less important. *M. ex rel. R. and S. v. Hoskins*, 77 F.R.D. 463, 467 n.2 (S. D. Ill. 1978) ("It would defeat any protection the informant may have under *McCray* if the accused could file a subsequent civil rights action against the official and then seek discovery of the informant.").

Although there was probable cause quite apart from the anonymous lead, expanding the "totality of the circumstances" to consider the call would bolster qualified immunity. *Parker v. Chard*, 777 F.3d 977 (8th Cir. 2015) (in civil-rights suit, holding that officers acted reasonably in detaining the plaintiffs because the officers had "corroborated the [actions] asserted in the [anonymous] tip"). Under federal and Arkansas law, an anonymous tip creates reasonable suspicion if it is "suitably corroborated and exhibit[s] sufficient indicia of reliability." *Parker*, 777 F.3d 977 (citations omitted); *Eastin v. Hobbs*, 688 F.3d 911 (8th Cir. 2012) (noting that Arkansas law considers whether the officer's personal observations corroborated the informant's statement). The caller said the plaintiff would be on a certain part of his land the morning of October 22, 2013, which the defendant verified; the caller said the plaintiff would be driving a silver truck, which the defendant verified; the caller said the plaintiff would have a modern rifle instead of a muzzleloader, which the defendant verified; and the caller said the plaintiff would be hunting deer, which the defendant reasonably concluded was the case. The caller's information was reliable and provides yet more suspicion for the charged violations.

## V.    Post-arrest search and seizure were proper and qualified immunity eliminates the tort claims.

The plaintiff finds fault with the impound of his truck, rifle, an all-terrain vehicle in the truck bed, and "other items of personal property." Doc. 1, ¶ 14. These post-arrest seizures were clearly valid.   Ark. R. Crim. P. 12.1(d) authorizes an officer to "make a search incidental to an arrest," for purposes of obtaining "evidence of the commission of the offense for which the accused has been arrested or to seize contraband . . . or other things used in conjunction with the offense." *Blair v. State*, 16 Ark. App. 1, 696 S.W.2d 755 (1985).  In *Blair*, the Arkansas Court of Appeals upheld the wildlife officers' search and seizure of a truck after the warrantless arrest for "attempting to take deer with a modern firearm in muzzle loading season."  *Id.*   The officers had seen "buckshot in the floorboard of [the hunter's] truck," and the Court agreed this ammunition "could certainly be said to be 'used in conjunction with the offense' of attempting to take deer with a modern weapon."  *Id.*

The defendant here saw the plaintiff put his modern rifle in his truck and then observed a spent casing in plain view on the passenger seat.  Doc. 1, pp. 14-16. The defendant noted a deer-skinning tool, blood finder, and other hunting equipment in the truck's cab.   *Id.*   The plaintiff's truck and its contents were therefore seized pursuant to the lawful arrest for hunting out of season.   This is valid as well under federal law, which recognizes a "lawful inventory search" exception to the Fourth Amendment.  *U.S. v. Arrocha*, 713 F.3d 1159 (8th Cir. 2013) (rejecting criminal defendant's claim that the arresting officer's "decision to tow

[his] SUV violated the Fourth Amendment").  Likewise, the defendant's survey of the surrounding land, deer stands, and cameras following the arrest was proper— an arresting officer "may search such premises or part thereof" if the officer believes the premises "contain things which are . . . subject to seizure and connected with the offense." Ark. R. Crim. P. 12.5(a).  It should be noted that the plaintiff does not dispute what the search uncovered: a freshly ejected casing from his modern rifle at the base of a deer stand; fresh deer tracks in the vicinity of the deer stand; fresh boot prints alongside the deer tracks; and no evidence of a feral hog.  Doc. 1, p. 17; Defendant's Exhibit A, pp. 1-2.

Probable cause for the plaintiff's arrest eliminates the tort claims based in criminal procedure.  *See* Doc. 1, ¶ 30.  Arkansas law has "recognized for some time that probable cause is a defense to a civil action for false arrest or false imprisonment in connection with a misdemeanor." *Mendenhall v. Skaggs Companies, Inc.*, 285 Ark. 236, 685 S.W.2d 805 (1985).  Likewise, the "probable-cause defense to an action for malicious prosecution" is well established. *Grandjean v. Grandjean*, 315 Ark. 620, 869 S.W.2d 709 (1994) (citations omitted).  The probable cause obvious from the pleadings disposes of claims for unlawful arrest, false imprisonment, and malicious prosecution.  Doc. 1, ¶ 30.

The claims of trespass and invasion of privacy fail because the defendant was on the plaintiff's land lawfully, under the open-field doctrine and a wildlife officer's statutory enforcement authority.  *Rainey v. Hartness*, 339 Ark. 293, 5 S.W.3d 410 (1999) (quoting Ark. Admin. Code 002.00.1-01.00-B ("Duties and Authorities of

Wildlife Officers")).  The remaining torts are either completely unsupported by facts (assault and battery, outrage, defamation) or insufficient to overcome qualified immunity under 42 U.S.C. § 1983 (negligence, conversion).  Doc. 1, ¶ 30; *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (pleadings must allege "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face") (quotation omitted); *S.S. v. McMullen*, 225 F.3d 960 (8th Cir. 2000) (even "gross negligence is not actionable . . . under § 1983"); *Holloway v. Pigman*, 884 F.2d 365 (1989) (plaintiff who alleges conversion has "at best stated a property claim not cognizable under 42 U.S.C. § 1983").  Although dismissal is proper under Fed. R. Civ. P. 12(c), the defendant's qualified immunity means the Court could also decline supplemental jurisdiction of all Arkansas-law claims.  28 U.S.C. § 1367(c)(3).

Respectfully submitted,

Leslie Rutledge,
Attorney General

By:      /s/ Charles Lyford
Arkansas Bar # 2010-200
Assistant Attorney General
323 Center Street, Suite 200
Little Rock, AR  72201-2610
Telephone: (501) 682-1307
Facsimile: (501) 682-2591
charles.lyford@arkansasag.gov

*Attorneys for Defendant*
*in his personal capacity*

## <u>CERTIFICATE OF SERVICE</u>

I, Charles Lyford, certify that on this 16th day of April, 2015, the foregoing was filed electronically using the CM/ECF system, which will notify the following:

Robert Jackson and Robby Golden
Wildlife Attorneys of Arkansas, PLLC
400 W. Capitol Ave., Suite 1700
Little Rock, AR 72201
Telephone: (501) 944-4263
Facsimile: (888) 830-6252

*Attorneys for Plaintiff*

<u>/s/ Charles Lyford</u>